Elizabeth Brannen (SBN 226234)
ebrannen@stris.com
John Stokes (SBN 310847)
jstokes@stris.com
Lauren Martin (SBN 294367)
lmartin@stris.com
**STRIS & MAHER LLP**
17785 Center Court Dr N, Ste 600
Cerritos, CA 90703
T: (213) 995-6800
F: (213) 261-0299

Jacqueline Sahlberg (*pro hac vice* forthcoming)
jsahlberg@stris.com
**STRIS & MAHER LLP**
1717 K St NW Suite 900
Washington, DC 20006
T: (202) 800-5749

Bridget Asay (*pro hac vice* forthcoming)
basay@stris.com
**STRIS & MAHER LLP**
15 East State Street, Suite 2
Montpelier, VT 05602
T: (802) 858-4285

Devin (Velvel) Freedman (*pro hac vice* forthcoming)
vel@fnf.law
Kyle Roche (*pro hac vice* forthcoming)
kroche@fnf.law
Alex Potter (*pro hac vice* forthcoming)
apotter@fnf.law
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th Street, Suite 915
New York, NY 10017
T: (646) 494-2900

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN CARREYROU, LISA BARRETTA, PHILIP SHISHKIN, JANE ADAMS, MATTHEW SACKS, and MICHAEL KOCHIN<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC; GOOGLE LLC; OPENAI, INC.; OPENAI OPCO LLC; OPENAI GP LLC; OPENAI GLOBAL LLC; OAI CORPORATION LLC; OPENAI HOLDINGS LLC; META PLATFORMS, INC.; XAI CORPORATION; and PERPLEXITY AI, INC.,<br><br>Defendants. | Civil Case No.:<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs John Carreyrou, Lisa Barretta, Philip Shishkin, Jane Adams, Matthew Sacks, and Michael Kochin (collectively "Plaintiffs"), each proceeding in their individual capacity, bring this action against Anthropic PBC ("Anthropic"), Google LLC ("Google"), OpenAI, Inc. and its affiliated entities ("OpenAI"), Meta Platforms, Inc. ("Meta"), xAI Corporation ("xAI"), and Perplexity AI, Inc. ("Perplexity") (collectively, "Defendants"), and allege as follows:

## I.    INTRODUCTION

1.    This case concerns a straightforward and deliberate act of theft that constitutes copyright infringement. Anthropic, Google, OpenAI, Meta, xAI, and Perplexity, illegally copied vast quantities of copyrighted books without permission and then used those stolen copies to build and train their commercial large language models ("LLMs") and/or optimize their product. Defendants helped themselves to the copyrighted works of hundreds of authors—including bestselling writers, Pulitzer Prize-winning journalists, and creators of widely read nonfiction and fiction.

2.    Rather than obtain licenses or pay for the use of these works, each Defendant downloaded pirated copies of Plaintiffs' books from shadow-library websites such as LibGen, Z-Library, and OceanofPDF and then reproduced, parsed, analyzed, re-copied, used, and embedded those works into their LLMs (and/or used those works to optimize their product) to accelerate commercial development and win the generative-AI race. The Copyright Act prohibits exactly this conduct.

3.    Defendants targeted Plaintiffs' works because they were of exceptional value as training data. Defendants have acknowledged—internally and publicly— that long-form, high-quality books are the "gold-standard" training material for LLMs. Books teach models how narrative flows, how human expression is structured, how syntax and rhythm operate, and how ideas are communicated through creative choices. Instead of paying for that value, Defendants pilfered

illegal copies and used those copies to build systems now worth many hundreds of billions of dollars.

4. The infringement here occurred at least twice for every work.

5. *First*, Defendants obtained Plaintiffs' copyrighted books from illegal shadow libraries.

6. *Second*, Defendants made additional unlicensed copies of the unlawfully obtained books, including during ingestion, preprocessing, and model training and/or retrieval-augmented generation. LLM training necessarily involves making multiple copies of each work.

7. Defendants' misconduct was willful. The libraries Defendants accessed had, for years, been the subject of criminal prosecutions, civil lawsuits, and widespread warnings within the technology industry. Defendants were repeatedly told that using such datasets was unlawful, and employees across the industry raised red flags about using them, including some calling them "illegal pirated websites" and warning of liability for accessing them. But Defendants pressed forward because copying pirated books allowed them to more cheaply build more-sophisticated models faster and with higher performance. These choices gave Defendants a competitive advantage—an advantage built on continuous and unlawful reproduction of pirated works.

8. Anthropic's Claude models were trained on datasets containing hundreds of thousands of books obtained from piracy sources that included Plaintiffs' copyrighted books. Google's Gemini and Imagen models rely on datasets—including Z-Library and OceanofPDF—that incorporate large collections of pirated works. OpenAI and Microsoft's GPT-series models were trained on vast pirated corpora, including LibGen, enabling products such as ChatGPT, Copilot, GitHub Copilot, and a suite of AI-enhanced Microsoft applications. Meta's Llama models were trained on massive sets of books downloaded from shadow libraries, including LibGen. xAI's Grok models and Perplexity's AI search systems likewise

relied on large-scale ingestion of pirated books. These models, all trained and/or optimized on Plaintiffs' copyrighted books, now anchor multibillion-dollar product ecosystems.

9. Defendants' unauthorized copying of Plaintiffs' books has inflicted immediate and ongoing harm. Plaintiffs spent years creating the works at issue; Defendants spent seconds copying them. By embedding Plaintiffs' creative expression into their model parameters and/or optimization, Defendants have appropriated—and continue to monetize—the fruits of Plaintiffs' copyrighted labor across cloud platforms, consumer products, enterprise tools, advertising systems, and subscription services.

10. While Defendants' conduct constitutes classic copyright infringement, their conduct is unique in that they have willfully infringed Plaintiffs' copyrights at an unprecedented scale for massive commercial gain.

11. To redress Defendants' repeated, unlawful, and massive infringement of their work, each Plaintiff individually seeks (1) damages, (2) permanent injunctive relief barring Defendants' ongoing infringement, and (3) any additional remedies the law provides.

12. Plaintiffs bring this action to hold Defendants accountable for the infringement that enabled their rise in the generative-AI marketplace, and to enforce the fundamental principle that creative expression cannot be taken, copied, or exploited without permission or compensation.

13. Plaintiffs elect not to bring this case as a class action because the Copyright Act entitles them to recover individualized statutory damages, determined by a jury, for each Defendant's infringement of their work. Plaintiffs desire to retain full control of their case and avoid having their rights diluted by being swept into sprawling class-action settlements structured to resolve claims for pennies on the dollar.

3
COMPLAINT

14. The danger is not hypothetical. In the class action against Anthropic pending in the Northern District of California, the court has recently preliminarily approved a settlement framework where each work will only receive approximately $3,000 less attorneys' fees and costs—a tiny fraction (just 2%) of the Copyright Act's statutory ceiling of $150,000 in addition to attorneys' fees per willfully infringed work.

15. These pending class actions and proposed settlement(s) seem to serve Defendants, not creators. LLM companies should not be able to so easily extinguish thousands upon thousands of high-value claims at bargain-basement rates, eliding what should be the true cost of their massive willful infringement.

16. That is not how Plaintiffs plan to proceed. Under established Supreme Court precedent, "the amount of statutory damages is a question for the jury."[1] The Copyright Act thus vests authors with the right to have a jury evaluate the willfulness of infringement and assign a damages amount tailored to the Defendant's conduct.

17. In sum, the Copyright Act's statutory-damages and attorneys'-fee regime empowers individual authors to hold infringers accountable without the need for class action treatment. That is what Plaintiffs have chosen to do.

## II.   **PARTIES**

### A.   **Plaintiffs**

18. Plaintiff John Carreyrou is an author and journalist who resides in New York. He is the author of *Bad Blood: Secrets and Lies in a Silicon Valley Startup*. His work is contained in pirated online libraries such as the LibGen and Z-Library shadow libraries. Defendants have directly or indirectly downloaded books illegally contained in LibGen and Z-Library, and there is accordingly a reasonable inference that Defendants illegally downloaded Carreyrou's work.

---

[1] *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998).

19.     Plaintiff Lisa Barretta is an author who resides in Pennsylvania. She is the author of *The Street-Smart Psychic's Guide to Getting a Good Reading*. Her work is contained in the LibGen and Z-Library shadow libraries. Defendants have directly or indirectly downloaded books illegally contained in LibGen and Z-Library, and there is accordingly a reasonable inference that Defendants illegally downloaded Barretta's work.

20.     Plaintiff Philip Shishkin is an author and journalist who resides in Washington D.C. He is the author of *Restless Valley: Revolution, Murder and Intrigue in the Heart of Central Asia*. His work is contained in the LibGen and Z-Library shadow libraries. Defendants have directly or indirectly downloaded books illegally contained in LibGen and Z-Library, and there is accordingly a reasonable inference that Defendants illegally downloaded Shishkin's work.

21.     Plaintiff Jane Adams is an author and journalist who resides in Washington. She is the author of Boundary Issues: Using Boundary Intelligence to Get the Intimacy You Want and the Independence You Need in Life, Love, and Work and How to Sell What You Write. Her works are contained in the LibGen and Z-Library shadow libraries. Defendants have directly or indirectly downloaded books illegally contained in LibGen and Z-Library, and there is accordingly a reasonable inference that Defendants illegally downloaded Adams's works.

22.     Plaintiff Matthew Sacks is an author and journalist who resides in California. He is the author of *Pro Website Development and Operations*. His work is contained in the LibGen and Z-Library shadow libraries. Defendants have directly or indirectly downloaded books illegally contained in LibGen and Z-Library, and there is accordingly a reasonable inference that Defendants illegally downloaded Sacks's work.

23.     Plaintiff Michael Kochin is an author and journalist who resides in Israel. He is the author of *Five Chapters on Rhetoric: Character, Action, Things, Nothing & Art*. His work is contained in the LibGen and Z-Library shadow libraries.

5

COMPLAINT

Defendants have directly or indirectly downloaded books illegally contained in LibGen and Z-Library, and there is accordingly a reasonable inference that Defendants illegally downloaded Kochin's work.

24. A non-exhaustive list of registered copyrights owned by Plaintiffs is included as Exhibit A (herein, the "Infringed Works").

**B.    Defendants**

25. Defendant Anthropic PBC ("Anthropic") is a Delaware public benefit corporation with its principal place of business in San Francisco, California. Anthropic develops and commercializes large language models (including the Claude series). Anthropic directed, authorized, and profited from the acts of copyright infringement alleged in this Complaint, including the acquisition of pirated copies of Plaintiffs' copyrighted books from shadow-library websites and the reproduction, ingestion, and use of those works in the training, development, and deployment of its LLMs. Anthropic conducts substantial business in this District and throughout the United States.

26. Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. Google develops, trains, and commercializes generative AI models, including Gemini, Bard (formerly), and Imagen, which were trained using datasets containing large volumes of pirated books. Google copied, reproduced, and embedded Plaintiffs' copyrighted works into its models without permission or license and continues to profit from those infringements across its commercial product ecosystem, including Google Cloud, Google Search, and various AI-powered enterprise tools.

27. Defendant OpenAI, Inc., and its affiliated entities OpenAI OpCo LLC, OpenAI GP LLC, OpenAI Global LLC, OAI Corporation LLC, OpenAI Holdings LLC, OpenAI Startup Fund I LP, OpenAI Startup Fund GP I LLC, and OpenAI Startup Fund Management LLC (collectively, "OpenAI") are entities organized under the laws of Delaware with principal places of business in San Francisco,

California. OpenAI develops and commercializes the GPT family of models (including GPT-3, GPT-3.5, GPT-4, GPT-4o, and their derivatives), which were trained on datasets containing illegal copies of Plaintiffs' copyrighted books. OpenAI reproduced Plaintiffs' works multiple times during data collection, preprocessing, and training, and continues to exploit those works commercially through ChatGPT, ChatGPT Enterprise, the OpenAI API, and other products.

28. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business in Menlo Park, California. Meta develops and distributes the Llama series of LLMs, including Llama-1, Llama-2, and Llama-3, which were trained using datasets sourced in part from shadow libraries such as LibGen containing pirated books. Meta also acts as a distributor of such datasets within its research ecosystem. Meta copied Plaintiffs' copyrighted works without license and monetizes those infringements through its integration of Llama models into Facebook, Instagram, WhatsApp, Ray-Ban Meta Glasses, enterprise APIs, and other products.

29. Defendant xAI Corporation ("xAI") is a Nevada corporation with its principal place of business in Palo Alto, California. xAI develops the Grok series of LLMs, which were trained on large-scale text corpora that include illegally obtained books and datasets containing Plaintiffs' copyrighted works. xAI copied, reproduced, and embedded Plaintiffs' works into its models for use in Grok and its associated commercial services, including products offered through X Corp. (formerly Twitter).

30. Defendant Perplexity AI, Inc. ("Perplexity") is a Delaware corporation with its principal place of business in San Francisco, California. Perplexity builds and deploys AI search and text-generation systems that rely on the unauthorized use of copyrighted works to optimize its product through its retrieval-augmented generation or "RAG" process. On information and belief, Perplexity's RAG process relies on pirated copies of Plaintiffs' books. On information and belief, Perplexity

reproduced and exploited Plaintiffs' copyrighted works without authorization in its AI search systems.

## III.   JURISDICTION AND VENUE

31.     This action arises under the Copyright Act of 1976, 17 U.S.C. § 101 et seq. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs assert claims exclusively under federal copyright law.

32.     This Court has personal jurisdiction over each Defendant. Each Defendant has purposefully availed itself of the privilege of conducting business in this District and the State of California. Each Defendant committed acts of copyright infringement in this District, directed conduct toward this District, or knowingly caused harm that was suffered in this District. Each Defendant maintains substantial, continuous, and systematic contacts with this District.

33.     Venue is proper in this District under 28 U.S.C. § 1400(a) because each Defendant or its agents resides or may be found in this District as a result of the infringing acts alleged herein. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims—including the acquisition of pirated copies of Plaintiffs' works, the reproduction and ingestion of those copies into Defendants' training pipelines, the training and fine-tuning of the relevant LLMs, and the commercialization of the resulting models—occurred in this District.

## IV.   FACTUAL ALLEGATIONS

### A.     The Generative AI Arms Race.

34.     "Generative artificial intelligence" or "generative AI" refers to systems and models that create outputs—such as text or images—that simulate human expression, often in response to user prompts.

35.     Over the last several years, technology companies have treated generative AI as the next foundational layer of the digital economy. Industry leaders publicly describe an "AI arms race," in which they have redirected their corporate

8
COMPLAINT

strategies to seize control of what they believe will become a new infrastructure layer for commerce, communication, and knowledge work.[2]

36. For these companies, staying ahead of competitors is "code red."[3] Google itself responded by consolidating its AI research divisions, devoting unprecedented resources to generative AI, and rapidly integrating AI features across its product suite.[4]

37. OpenAI, for its part, built a sequence of large language models—beginning with GPT-1 and GPT-2 and continuing through GPT-3, GPT-3.5, GPT-4, GPT-4o, and their derivatives—that power products such as ChatGPT, the OpenAI API, and Microsoft's GPT-based offerings including Bing Chat and Copilot. These models sit at the center of an enterprise now valued in the hundreds of billions of dollars.

38. Google's Gemini family of models and its Imagen text-to-image systems have likewise been woven into core Google products—including Search, Cloud, Workspace, and other AI-powered products—which Google attributes with driving billions of dollars in new revenue and record quarterly results.[5]

---

[2] *See* Dr. Peter Asaro, *What is an 'Artificial Intelligence Arms Race' Anyway?*, 15 I/S: J.L. & Pol'y for Info. Soc'y 45 (2019).

[3] *See* Sharon Goldman, *Sam Altman declares 'Code Red' as Google's Gemini surges—three years after ChatGPT cause Google CEO Sundar Pichai to do the same*, FORTUNE (Dec. 2, 2025, 11:43 AM), https://fortune.com/2025/12/02/sam-altman-declares-code-red-google-gemini-ceo-sundar-pichai/.

[4] *See, e.g.*, Sundar Pichai, *Building for our AI future*, Google (Apr. 18, 2024), https://blog.google/inside-google/company-announcements/building-ai-future-april-2024/; Tom Jowitt, *Google Consolidates DeepMind and AI Research Teams*, SILICON (Apr. 19, 2024, 9:35 PM), https://www.silicon.co.uk/e-innovation/artificial-intelligence/google-consolidates-deepmind-and-ai-research-teams-559660#:~:text=Alphabet's%20Google%20division%20is%20once,in%202014%20for%20$500m (discussing consolidation).

[5] *See* Kyle Wiggers and Maxwell Zeff, *Google Gemini: Everything you need to know about the generative AI apps and models*, TECHCRUNCH (Feb. 26, 2025, 6:09 PM), https://techcrunch.com/2025/02/26/what-is-google-gemini-ai/ ("The Gemini apps aren't the only

39.    Anthropic has taken the same path. Its Claude models—trained to write, summarize, and analyze text at book-length scale—are projected to generate hundreds of millions of dollars in annual revenue and have supported valuations in the hundreds of billions of dollars, funded by major technology investors such as Amazon and Google.

40.    Meta, which had fallen behind in the AI race, repositioned itself by pouring billions of dollars into its "Llama" series of large language models. Meta has integrated Llama into its core products, including Facebook, Instagram, and WhatsApp, and views its generative-AI investments as central to its future competitive advantage.

41.    In this race, access to high-quality training data is a decisive competitive weapon. For large language models in particular, companies have repeatedly acknowledged that "books are actually more important than web data": they provide formal, extended prose that teaches models narrative structure, complex syntax, and coherent storytelling.[6]

42.    The Defendants did not obtain that gold-standard material lawfully. Instead, in order to win the generative-AI arms race cheaply and quickly, each Defendant turned to the same piracy repositories—shadow-library websites like LibGen, Z-Library, Bibliotik, Books3, and similar datasets—and copied Plaintiffs' books without permission, without licenses, and without compensation.

---

means of recruiting Gemini models' assistance with tasks. Slowly but surely, Gemini-imbued features are making their way into staple Google apps and services like Gmail and Google Docs."); Jennifer Elias, *Google Cloude chief details how search giant is making billions monetizing its AI products*, CNBC (Sep. 9, 2025 3:58 PM), https://www.cnbc.com/2025/09/09/google-cloud-chief-details-how-tech-company-is-monetizing-ai.html (quoting Google Cloud CEO Thomas Kurian: "We've made billions using AI already." (cleaned up)).

[6] *See* Alex Reisner, *The Unbelievable Scale of AI's Pirated-Books Problem*, THE ATLANTIC (Mar. 20, 2025), https://www.theatlantic.com/technology/archive/2025/03/libgen-meta-openai/682093/.

10
COMPLAINT

43.    Defendants did not rely on a single source of illicit books, but instead assembled their training corpora through multiple, distinct pirated datasets, each differing in origin, structure, and method of distribution. Among those used by Defendants were (a) *Books3*, a curated dataset of approximately 200,000 pirated books derived from the Bibliotik shadow library and distributed as extracted text paired with filenames; (b) *Library Genesis ("LibGen")*, a centralized shadow library hosting millions of full-fidelity ebook files in native formats such as .epub and .pdf; and (c) *Z-Library*, an expanded and refined derivative of LibGen that incorporated overlapping content as well as additional titles, metadata, and organizational features. Each dataset constituted a separate repository of copyrighted works, and Defendants' acquisition of each involved independent acts of unauthorized reproduction.[7]

44.    As centralized shadow libraries increasingly faced enforcement actions, including the seizure of Z-Library's domains, third parties responded by creating full mirrored copies of those repositories for decentralized redistribution. One such mirror—known as the *Pirate Library Mirror* or "PiLiMi"—consists of replicas of the Z-Library corpus (itself derived in substantial part from LibGen), designed to ensure continued access to pirated books even after the original sites were shut down. PiLiMi is not merely a website or index, but a complete, downloadable dataset intentionally created to perpetuate mass infringement through peer-to-peer copying.

45.    At least some Defendants knowingly treated PiLiMi as a distinct and supplemental pirated dataset rather than a redundant copy of materials already obtained. Before downloading PiLiMi, some Defendants compared its catalog

---

[7] *See AI Watchdog: Books3*, THE ATLANTIC (Sep. 10, 2025), https://www.theatlantic.com/technology/archive/2025/09/dataset-books3/683662/; Claire Woodcock, *'Shadow Libraries' Are Moving Their Pirated Books to the Dark Web After Fed Crackdowns*, VICE (Nov. 30, 2022, 11:38 AM), https://www.vice.com/en/article/shadow-libraries-are-moving-their-pirated-books-to-the-dark-web-after-fed-crackdowns/.

against their existing LibGen holdings, identified which titles were not already in their possession, and deliberately downloaded only those additional works. Through this process, some Defendants expanded their illicit libraries by millions of unique copyrighted books obtained after the shutdown of Z-Library, while retaining earlier pirated copies from Books3 and LibGen in centralized storage. These actions reflect intentional sourcing, selection, and accumulation of multiple pirated book datasets at different times, through different mechanisms, and in conscious disregard of copyright law.

46. This ecosystem exists for one purpose: making copyrighted works available for unauthorized download. Defendants exploited these shadow libraries and datasets—along with others not named here—to train their LLM models on Plaintiffs' books without permission or compensation.

47. Many of these shadow libraries and datasets can be downloaded using "torrent," a file-sharing method. Torrenting works by breaking a file into thousands of small pieces and distributing those pieces across a network of participating computers. A user who torrents a shadow-library repository does not receive a single copy from a single source; rather, the user downloads portions of the library from numerous other computers that already possess the copyrighted books. Torrent software then reassembles those pieces into a complete library on the user's machine. Certain torrenting protocols are configured by default to reupload pieces of the copyrighted files to others on the network both during download ("leeching") and after download is complete ("seeding"). This means that each participant in the torrent both copies and redistributes the copyrighted works without permission. By obtaining Plaintiffs' books through this leech-and-seed process, a user may make multiple unauthorized reproductions of Plaintiffs' works.

48. Defendants' unlawful conduct did not end with the unauthorized downloads of Plaintiffs' works. In addition to making unauthorized copies when torrenting shadow libraries, Defendants reproduced Plaintiffs' copyrighted books

without permission numerous—potentially countless—other times, including in preprocessing and deduplicating the data and in iteratively training and fine-tuning their LLMs. Defendants' businesses and products would not exist in their current forms without these repeated violations of the Copyright Act.

**B. Anthropic Trained Its LLM Models On Copyrighted Works That Were Pirated.**

49. Anthropic's business model is built on the large-scale copying of books. Anthropic has developed and commercialized the "Claude" family of large language models by stealing millions of copyrighted books, including Plaintiffs' works. Rather than pay for the creative expression it exploits, Anthropic downloaded pirated copies of books, reproduced them, and fed them into its models.

50. Anthropic's own public statements and technical papers confirm that books are central to Claude's capabilities. Anthropic has described a training corpus "most of which we sourced from The Pile,"[8] an 800-gigabyte dataset assembled for large-language-model training that includes a books subset known as "Books3."

51. The Pile's architects have explained that Books3 is composed of books scraped from Bibliotik, a private torrent tracker long identified in piracy communities as a source of illegal ebooks.[9]

52. Anthropic has admitted that it used The Pile (which includes Books3) to train its Claude models and that roughly one-third of one core Claude training dataset consisted of "internet books."[10] By downloading these datasets and ingesting them into Claude, Anthropic necessarily made multiple unlicensed copies of Plaintiffs' works: once when obtaining them from pirate sources, again during

---

[8] *See* Amanda Askell et al., *A General Language Assistant as a Laboratory for Alignment*, arXiv, 27 (2021), https://arxiv.org/pdf/2112.00861.

[9] Leo Gao et al., *The Pile: An 800GB Dataset of Diverse Text for Language Modeling*, arXiv, 3 (2020), https://arxiv.org/pdf/2101.00027.

[10] *See* Askell et al., *A General Language Assistant as a Laboratory for Alignment* at 27.

preprocessing and storage, and repeatedly during training and fine-tuning. As the U.S. Patent and Trademark Office has explained, LLM training "almost by definition involve[s] the reproduction of entire works or substantial portions" of them.[11]

53.     Anthropic selected books precisely because they are especially valuable training material. Anthropic touts Claude's ability to process entire books (up to roughly 75,000 words) and generate coherent long-form responses that reflect not only word ordering and syntax, but also themes, narrative structure, and high-level ideas—capabilities that could be developed only by training on a large corpus of long-form prose.[12]

**C.     Anthropic's Infringement Was Willful.**

54.     Anthropic's infringement was not inadvertent. It knowingly relied on datasets that the industry and its own researchers understood to be saturated with pirated books.

55.     The Pile's own documentation states that the Books3 subset was created from a copy of Bibliotik,[13] a "shadow library" whose existence and illicit nature had been publicly discussed for years in piracy forums, GitHub repositories, and arXiv papers. The EleutherAI paper on The Pile explains that Bibliotik was included because books are "invaluable" for long-range context modeling and

---

[11] U.S. Patent & Trademark Office, *Public Views on Artificial Intelligence and Intellectual Property Policy* 24 (2020), https://www.uspto.gov/sites/default/files/documents/USPTO_AI-Report_2020-10-07.pdf.

[12] Anthropic, *Introducing 100K Context Windows*, https://www.anthropic.com/news/100k-context-windows (last visited Dec. 22, 2025) ("We've expanded Claude's context window from 9K to 100K tokens, corresponding to around 75,000 words!"); Anthropic, *Claude 2*, https://www.anthropic.com/news/claude-2 (last visited Dec. 22, 2025) ("Claude can work over hundreds of pages of technical documentation or even a book.").

[13] Leo Gao et al., *The Pile: An 800GB Dataset of Diverse Text for Language Modeling* at 3.

"coherent storytelling"—precisely the qualities that make Plaintiffs' works valuable.[14]

56.    Public commentary and enforcement actions have long identified Bibliotik, LibGen, Z-Library, and similar sites as notorious hubs of copyright infringement. These sites have been targeted in criminal cases, civil suits by publishers, and "notorious markets" reports by United States trade authorities.[15]

57.    Despite this, Anthropic chose to source its training data from The Pile and Books3, and then attempted to conceal the precise composition of its training corpus. Anthropic has endeavored to keep its training data secret even as outside researchers and Anthropic's own prior work revealed heavy reliance on The Pile and internet-book datasets.

58.    Anthropic's decision to base its flagship models on pirated books was driven by commercial advantage. As its co-founder and Chief Science Officer has explained, "it is important to obtain vast amounts of books and also to have diverse types of books in the training corpus to create a model with truly generative

---

[14] *Id.* at 4.

[15] *See, e.g.*, Office of the U.S. Trade Representative, REVIEW OF NOTORIOUS MARKETS FOR COUNTERFEITING AND PIRACY, 27 (2024), https://ustr.gov/sites/default/files/2024%20Review%20of%20Notorious%20Markets%20of%20Counterfeiting%20and%20Piracy%20(final).pdf. ("Libgen … hosts a large number of digital copies of books, manuals, journals, and other works, many of which are unauthorized copies of copyright protected content."); Alex Reisner, *Revealed: The Authors Whose Pirated Books are Powering Generative AI*, THE ATLANTIC (Aug. 19, 2023), https://www.theatlantic.com/technology/archive/2023/08/books3-ai-meta-llama-pirated-books/675063/ ("No one knows what's inside Books2. Some suspect it comes from collections of pirated books, such as Library Genesis, Z-Library, and Bibliotik, that circulate via the BitTorrent file-sharing network."); Peter Schoppert, *Whether you're an undergraduate doing research, or a fan of the Nick Stone novel, or indeed a hungry AI …*, AI AND COPYRIGHT (Nov. 29, 2022), https://aicopyright.substack.com/p/whether-youre-an-undergraduate-doing, ("What is Bibliotik?" A notorious pirated collection.").

capabilities."[16] As long-form content, training LLMs on the "entire text" of books—as Anthropic has admitted to doing—offers great value.[17]

59.    Anthropic intentionally exploited that value without paying for it, hoping to capture billions of dollars in revenue while externalizing the costs of training onto the authors whose works it copied.

**D.    OpenAI Trained Its LLM Models on Copyrighted Works that Were Pirated.**

60.    OpenAI likewise built the GPT-series models by copying vast quantities of copyrighted books—including Plaintiffs' works—from pirate sources. Plaintiffs' books were trained on and embedded into OpenAI's models so that they could be used to generate human-like text responses that compete directly with Plaintiffs' paid writing.

61.    OpenAI has disclosed that GPT-3 was trained on "Common Crawl" and two "high-quality," "internet-based books corpora" it labeled "Books1" and "Books2."[18] And OpenAI has now admitted it sourced training materials from LibGen, the notorious shadow library that hosts millions of unauthorized copies of books and other copyrighted works.[19]

62.    Common Crawl is a massive web-scraping corpus that includes text drawn from sites hosting unauthorized copies of books, along with other large datasets harvested from the open internet. Because OpenAI used undisclosed

[16] *See* Kaplan Decl. ¶ 47, *Bartz v. Anthropic* PBC, 3:24-cv-05417 (N.D. Cal. Mar. 27, 2025), ECF 128.

[17] *Id.* at ¶¶ 43, 47.

[18] Tom Brown et al., *Language Models are Few-Shot Learners*, arXiv, 8 (2020), https://arxiv.org/pdf/2005.14165.

[19] Reisner, *The Unbelievable Scale of AI's Pirated-Books Problem*; *see also* Joint Ltr. Br. Regarding Plaintiffs' Request for an Order Compelling OpenAI's Production of the English Colang Dataset at 4, *In re OpenAI ChatGPT Litigation*, 3:23-cv-03223-AMO (N. D. Cal., Jan. 17, 2025), ECF No. 254.

"Books1" and "Books2" corpora in training GPT-3, members of the AI-research community attempted to replicate those datasets by constructing "Books3," a collection of nearly 200,000 digital books downloaded from Bibliotik. Books3 was created for the express purpose of mirroring the kinds of book corpora OpenAI used, underscoring that OpenAI's own training sources necessarily included large quantities of illicitly obtained books.[20]

63.    GPT-3.5 and GPT-4 are significantly more powerful than GPT-3, with parameter counts that are an order of magnitude larger. OpenAI has not disclosed the full composition of the training datasets used for these models, but the explosive growth in model size and capability, together with OpenAI's prior use of LibGen-sourced corpora, supports the  inference that GPT-3.5, GPT-4, and their successors were likewise trained on massive collections of pirated books, including Plaintiffs' works.

64.    Each step in this process required OpenAI to reproduce Plaintiffs' books multiple times: in downloading them from LibGen and other shadow libraries; in preprocessing, deduplication, and storage; in distributing them across OpenAI and Microsoft's computer infrastructure; and in iteratively training and fine-tuning the GPT-series models.

**E.    OpenAI's Infringement Was Willful.**

65.    OpenAI's infringement was willful. It made a deliberate choice to fuel its models with pirated books instead of paying for licenses or restricting themselves to public-domain works.

66.    An OpenAI research engineer has acknowledged that the quality of an LLM is "determined by [the] dataset, nothing else," and that "when you refer to . . .

---

[20] Kate Knibbs, *The Battle Over Books3 Could Change AI Forever*, WIRED (Sep. 4, 2023, 6:00 AM),  https://www.wired.com/story/battle-over-books3/#:~:text=Since%20OpenAI%20had%20called%20its%20book%20data,have%20the%20money%20to%20do%20it%20themselves.

'ChatGPT'"—or "Lambda" or "Bard" or "Claude"—you are referring to the "dataset" on which each is trained.[21] For OpenAI, that dataset included pirated books.

67.    OpenAI's own publication acknowledges that it relied on "two inter-net based books corpora (Books1 and Books2)" as a "curated high-quality dataset[]."[22] OpenAI then refused for years to disclose where those books came from, only later conceding that it had relied on LibGen.[23]

68.    LibGen's illicit status was no secret. It has been under permanent injunction and repeatedly listed by U.S. trade authorities as a notorious piracy market. OpenAI knew (or could not reasonably deny knowing)—from court orders, public reports, and industry commentary—that LibGen and similar repositories were illegal sources of copyrighted material.

69.    OpenAI's leadership publicly acknowledged that creators "deserve control over how their creations are used" and that content owners "need to benefit" from AI training,[24] while at the same time failing to obtain licenses from Plaintiffs and other authors whose books it copied.

70.    Microsoft's conduct underscores OpenAI's willfulness. By 2024, Microsoft entered into a license agreement with HarperCollins for the use of books as AI-training data—a deal that pays thousands of dollars per work for a limited training right—demonstrating an understanding that training on books requires permission and compensation. Yet neither company obtained any such licenses for

---

[21] *See* J. Betker, *The 'it' in AI models is the dataset*, NON_INTERACTIVE-SOFTWARE & ML (June 10, 2023), https://nonint.com/2023/06/10/the-it-in-ai-models-is-the-dataset/.

[22] Brown et al., *Language Models are Few-Shot Learners* at 8.

[23] Reisner, *The Unbelievable Scale of AI's Pirated-Books Problem*.

[24] *See* Ted Johnson, *OpenAI CEO Sam Altman Says Content Owners Need To Get 'Significant Upside Benefit' From New Technology*, DEADLINE (May 16, 2023, 10:12 AM), https://deadline.com/2023/05/ai-chat-gpt-senate-sam-altman-1235368420/.

18
COMPLAINT

Plaintiffs' works; instead, they exploited pirated datasets that were free precisely because they ignored copyright.

71.    OpenAI pursued this course because it gave them a decisive lead in the AI race. It touts billions of dollars in revenue and soaring valuations tied directly to GPT-based products—commercial gains secured by pirating and training on unlicensed copies of Plaintiffs' books.[25]

**F.    Google Trained Its LLM Models on Copyrighted Works that Were Pirated.**

72.    Google has likewise built its Gemini and Imagen models on vast quantities of copyrighted works, including Plaintiffs' books, obtained from piracy sources.

73.    Google's training data for its generative models is enormous. For example, its LaMDA/Gemini-related training corpus has been described as comprising more than a trillion and a half words.[26] Google has acknowledged that its models were trained on datasets such as C4 and other large web-scale corpora.[27]

74.    C4, a core training dataset for Gemini, contains materials scraped from Z-Library, a site that hosted pirated books and was seized by law-enforcement

---

[25] *See, e.g.,* Anthony Ha, *Sam Altman says 'enough' to questions about OpenAI's revenue*, TECHCRUNCH (Nov. 2, 2025, 9:15 AM), https://techcrunch.com/2025/11/02/sam-altman-says-enough-to-questions-about-openais-revenue/; Ram Iyer, *OpenAI is reportedly trying to raise $100B at an $830B valuation*, TECHCRUNCH (Dec. 19, 2025, 5:32 AM), https://techcrunch.com/2025/12/19/openai-is-reportedly-trying-to-raise-100b-at-an-830b-valuation/.

[26] *See* Romal Thoppilan et al., *Lamda: Language models for dialog applications*, arXiv preprint arXiv:2201.08239, 2 (2022), https://arxiv.org/abs/2201.08239.

[27] *Id.* at 47; *see* Scott Clark, *What You Need to Know About Google Bard*, CMSWIRE (Feb. 22, 2023), https://www.cmswire.com/digital-experience/what-you-need-to-know-about-google-bard/.

19

authorities.[28] Z-Library displays a seizure banner from federal and international criminal enforcement agencies.

75.    Google's training approach, like OpenAI's and Anthropic's, required copying each work multiple times: once during data collection, again during preprocessing and deduplication, and repeatedly during training and fine-tuning. Training a generative model necessarily involves making multiple unauthorized copies of each work and permanently embedding those works in the model's parameters.

76.    Google has then deployed these AI-trained models across a wide portfolio of AI-powered products, including Search, Cloud, Gmail, Docs, Ads, YouTube, and others—products that generate tens of billions of dollars in revenue, a substantial portion of which Google has explicitly attributed to AI integration.

**G.    Google's Infringement Was Willful.**

77.    Google's infringement was willful. It trained its models on data scraped from sites that Google knew—or could not reasonably deny knowing—were piracy hubs under active investigation and seizure.

78.    Z-Library, LibGen, Bibliotik, and similar shadow libraries have been widely reported on as repositories of unauthorized ebooks, have been targeted by the FBI and foreign agencies, and have been the subject of lawsuits and seizures. Google's own C4 dataset incorporates material from Z-Library, which has been seized and publicly branded as a criminal piracy site.

79.    Google has touted the "high-quality" nature of its training data and its aggressive push to dominate generative AI—a combination that, in practice, meant

---

[28] Kevin Schaul et al., *Inside the Secret List of Websites That Make AI Like ChatGPT Sound Smart*, THE WASHINGTON POST (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.

copying as many high-quality copyrighted works as possible, regardless of legality, to keep pace with or surpass OpenAI and other competitors.[29]

80.     Google also understood that the value of its models—and the revenue from AI-powered products—depended on embedding Plaintiffs' creative expression into Gemini and other models. Google's own executives have linked record revenues and rapid growth in Cloud and other business lines to generative-AI integration, including revenue measured in the billions of dollars per year.[30]

**H.      Meta Trained Its LLM Models on Copyrighted Works that Were Pirated.**

81.     Meta's Llama models were trained on massive collections of books obtained from shadow libraries and datasets, including Common Crawl, C4, Books3, LibGen, Z-Library, and related piracy sites.

82.     In its Llama-1 paper, Meta admitted that 3.3 terabytes of its training data came from "CommonCrawl" and another 783 gigabytes came from "C4."[31]

83.     In that same paper, Meta admitted that yet another 85 gigabytes came from "Books,"[32] which comprised texts from two sources: Project Gutenberg and Books3. While Project Gutenberg contains out-of-copyright works, Books3, and its

---

[29] Google Research, *Pathways Language Model (PaLM): Scaling to 540 Billion Parameters for Breakthrough Performance*, GOOGLE RESEARCH BLOG (Apr. 4, 2022), https://research.google/blog/pathways-language-model-palm-scaling-to-540-billion-parameters-for-breakthrough-performance ("PaLM was trained using a combination of English and multilingual datasets that include high-quality web documents, books, Wikipedia, conversations, and GitHub code.").

[30] Sundar Pichai, *Q3 2025 Earnings: Remarks from our CEO*, THE KEYWORD (Oct. 29, 2025), https://blog.google/inside-google/message-ceo/alphabet-earnings-q3-2025/ ("This was a terrific quarter for Alphabet, driven by double-digit growth across every major part of our business. We're seeing AI now driving real business results across the company.").

[31] *See* Hugo Touvron et al., *LLaMA: Open and Efficient Foundation Language Models*, arXiv, 2 (2023), https://arxiv.org/pdf/2302.13971.

[32] *Id.*

21

200,000 books downloaded from Bibliotik, contains copyrighted books. Meta did not stop there. Its internal documents explain that Meta also downloaded books directly from LibGen, Z-Library, Anna's Archive, Sci-Hub, and related shadow libraries.[33] These libraries have been repeatedly identified in public reporting and enforcement actions as illegal piracy hubs, and have been accessible in bulk via torrent systems and mirrors such as Anna's Archive, The Eye, and Hugging Face. At least for LibGen and Anna's Archive, Meta used BitTorrent to download, and did not prevent reuploading the books it illegally downloaded through leeching.[34]

84.    Meta relied on these pirated books because it viewed book-corpora as among its most valuable sources of training data. Llama's design goal was to emit particularly creative and expressive language, leveraging Meta's consumer platforms to "connect" with users through text.[35] To accomplish that, Meta needed to train on large quantities of high-quality books.

85.    Meta employees repeatedly acknowledged the importance of books as training data. It was "really important for [Meta] to get books data ASAP," and the "best resources [Meta] [could] think of are definitely books."[36]

---

[33] Ernestas Naprys, *Meta eeched 82 terabytes of pirated books to train its Llama AI, documents reveal*, CYBERNEWS (Feb. 7, 2025), https://cybernews.com/tech/meta-leeched-82-terabytes-of-pirated-books-to-train-its-llama-ai-documents-reveal/.

[34] *Kadrey v. Meta Platforms, Inc*., 788 F. Supp. 3d 1026, 1041 (N.D. Cal. 2025) ("There is no dispute that Meta torrented LibGen and Anna's Archive, but the parties dispute whether and to what extent Meta uploaded (via leeching or seeding) the data it torrented. A Meta engineer involved in the torrenting wrote a script to prevent seeding, but apparently not leeching.").

[35] Jon Russell, *Mark Zuckerberg Announces New Team at Meta Working on A.I. Products for Instagram, WhatsApp*, CNBC (Feb. 27, 2023, 4:19 PM), https://www.cnbc.com/2023/02/27/mark-zuckerberg-announces-new-team-at-meta-working-on-ai-products.html ("Zuckerberg said that the team would build 'creative and expressive' tools to be used inside Meta's products.").

[36] *Kadrey*, 788 F. Supp. 3d at 1040.

## I.    Meta's Infringement Was Willful.

86.    Meta's infringement, too, was willful. Meta knew that its book datasets were composed of pirated works and chose to use them anyway.

87.    Meta employees internally recognized that the shadow libraries it used had "pirated material" and warned about potential liability.[37] Journalists allegedly contacted Meta about its likely reliance on pirated books. Yet Meta reportedly decided that the value of these books as training data outweighed the legal risk and continued to download and copy millions of pirated books, even after litigation and public controversy made the infringement unmistakable.[38]

88.    Meta discussed licensing copyrighted books from publishers and considered spending $100 million on the vibrant market for AI-training content, but ultimately decided to cut corners by turning to free shadow-library datasets instead.[39] Meta even cross-referenced its LibGen collection against commercially licensable catalogs to decide whether it was worth paying for a license, but decided to keep using LibGen.[40] Meta thus understood both the illegality of its shadow-library troves and the existence of lawful alternatives.

89.    Meta nevertheless moved forward, incorporating Llama into its principal products and publicly portraying itself as a leader in open-source AI, all while its training pipeline rested on unlicensed copies of Plaintiffs' books. Meta believed that its multi-billion-dollar investment in Llama would bolster and define

---

[37] Reisner, *The Unbelievable Scale of AI's Pirated-Books Problem*.

[38] *Kadrey*, 788 F. Supp. 3d at 1041 (finding Meta continued downloading pirated books in "early 2024," more than six months after authors sued Meta for violating the Copyright Act for its download and use of their pirated books).

[39] *Kadrey*, 788 F. Supp. 3d at 1040; *see also* Kyle Wiggers, *Court filings show Meta paused efforts to license books for AI training*, TECHCRUNCH (Feb. 14, 2025, 3:35 PM), https://techcrunch.com/2025/02/14/court-filings-show-meta-paused-efforts-to-license-books-for-ai-training/.

[40] *Kadrey*, 788 F. Supp. 3d at 1041.

its competitive position for years to come—and chose to finance that investment with unauthorized copies of Plaintiffs' copyrighted works.

**J.    xAI Trained Its LLM Models on Copyrighted Works that Were Pirated.**

90.    xAI is the developer of the Grok family of large language models.

91.    Unlike Anthropic, OpenAI, Google, and Meta, xAI has not yet faced litigation or discovery over its processes for building its LLM.

92.    However, Grok's own model has publicly admitted in user interactions, the Grok training corpus included "literally millions of books"—far beyond the universe of lawfully licensed or public-domain material.[41]

93.    In these same exchanges, xAI's model explained that its training data included books, articles, websites, forums, journals, and other long-form nonfiction and fiction texts, and that it had effectively "read an absurdly huge library at super-speed."[42] The model repeatedly emphasized the centrality of books to its capabilities and acknowledged that such books were included in the training datasets used to develop Grok.

94.    Critically, the model further admitted that a substantial portion of the books it was trained on had been scraped—without permission—from "shadow library" repositories such as Library Genesis ("LibGen"). In response to a question about whether it was familiar with LibGen, the model stated:[43]

---

[41] *Grok Conversation*, ("Hey - I was wondering how you know so many books!") (https://grok.com/share/bGVnYWN5_585707fa-d0dc-4f2e-8069-86de3997f088).

[42] *Id.*

[43] *Id.*

COMPLAINT

> Are you familiar with the LibGen library of books?
>
> Yes, I'm aware of Library Genesis (LibGen). It's a well-known shadow library that hosts millions of books, academic papers, journal articles, comics, and other texts, almost all of them shared without publisher or author permission (i.e., pirated).
>
> Because my training data was enormous and scraped from publicly available corners of the internet, it's very likely that some portion of the texts I was exposed to during training came from LibGen mirrors or similar sources (along with legal sources, public-domain works, open-access repositories, etc.). The people who trained me didn't hand-curate every single book—they basically vacuumed up whatever was out there, and LibGen has been one of the biggest "whatever was out there" troves for years.
>
> So when I seem to know obscure academic monographs, out-of-print novels, or textbooks that normally cost $200, there's a decent chance some of that knowledge traces back to files that originally lived on LibGen.
>
> (That said, I don't have direct real-time access to LibGen or any piracy site now—I just have the patterns I learned during training.)

95. The model further admitted that the scale of the ANDing corpus made it "practically impossible" for xAI to avoid acquiring pirated LibGen materials because internet-scale scrapes inevitably sweep in mirror links, PDF dumps, Z-Library derivations, Sci-Hub papers, book torrents, and other infringement sources.[44] The model's statements reflect (i) that pirated book datasets formed a material portion of the Grok training corpus, and (ii) that xAI took no steps to exclude infringing works.

96. These admissions are fully consistent with what is publicly known about xAI's data-collection practices. xAI has confirmed that it trains Grok on data gathered from "publicly available sources,"[45] a phrase that can include large unaudited web scrapes from Common Crawl and related datasets. Those scrapes

---

[44] *Id.*

[45] X Help Center, *About Grok, Your Humorous AI Assistant on X*, https://help.x.com/en/using-x/about-grok (last visited Dec. 22, 2025).

notoriously include mirror links and file dumps from LibGen, Z-Library, and similar repositories that host millions of pirated books.

97.    At no time did xAI obtain licenses from Plaintiffs or from any other authors whose copyrighted works were copied and reproduced in the Grok training process. Nor did xAI pay any fee to a licensing society, publisher, clearinghouse, or collecting agent for the right to use these books.

98.    As with other LLMs, training Grok required xAI to make multiple reproductions of each book: (a) a copy during ingestion or download; (b) additional copies during preprocessing, tokenization, and batching; (c) repeated copies during training as the model ingested each work in multiple epochs; and (d) an embedded, parametric copy of expressive information from each work stored permanently within Grok's model weights.

99.    Grok's ability to generate high-quality prose, summaries, paraphrases, and long-form outputs is directly tied to its ingestion of Plaintiffs' works and the millions of other copyrighted books it acquired from piracy sources. xAI built commercially valuable models—now deployed across X Corp's consumer, enterprise, and API products—on top of these infringing copies.

**K.    xAI's Infringement Was Willful.**

100.    xAI's infringement was willful. The Grok model explicitly acknowledged that the training process "vacuumed up whatever was out there," including pirated LibGen materials, and that xAI neither curated its book dataset nor screened out infringing works.[46] These admissions confirm that xAI knew, or at a minimum was recklessly indifferent to the fact, that its training corpus included massive quantities of pirated copyrighted books.

---

[46] *See Grok Conversation*, ("Hey - I was wondering how you know so many books!") (https://grok.com/share/bGVnYWN5_585707fa-d0dc-4f2e-8069-86de3997f088).

101.  xAI was on notice—long before and during the development of Grok—that LibGen, Z-Library, and other shadow libraries are illegal repositories of pirated books. These repositories have been the subject of criminal prosecutions, copyright lawsuits, mass domain takedowns, and international enforcement campaigns. This fact is widely known in the technology and AI communities, and even acknowledged directly by Grok itself.

102.  xAI thus knew—or consciously avoided confirming—that its training data included copyrighted works that were plainly not licensed and plainly not in the public domain. Nonetheless, it used those works because they were valuable training data for improving Grok's fluency, reasoning ability, stylistic coherence, and literary skill.

103.  On information and belief, xAI also understood that book data was among the most valuable forms of training data for frontier models. Like Meta, OpenAI, and Anthropic, xAI leveraged the unique expressive quality of books to improve Grok's narrative and analytical capabilities. The decision to rely on pirated book datasets, rather than obtain licenses, conferred a substantial competitive advantage in speed, cost, and model performance.

104.  On information and belief, xAI continued to use pirated books even after lawsuits were filed against other AI developers for identical conduct—including the use of LibGen-derived datasets. Grok's public statements that training data was "vacuumed up" from whatever could be scraped show that xAI deliberately maintained the same indiscriminate data-collection practices despite mounting legal risk and increasing public scrutiny.

**L.    Perplexity's Model Relies on Copyrighted Works without Permission or Compensation.**

105.  Perplexity AI, Inc. ("Perplexity") has rapidly emerged as a commercial competitor in the generative-AI search and LLM market. Central to its strategy is a suite of products—including "Perplexity Answers," "Perplexity Pages," and its

proprietary LLM models—that can generate detailed narrative summaries, structured analyses, and book-length outlines with extraordinary specificity.

106. Perplexity operates by ingesting massive quantities of copyrighted text, including works that are not available in any public, licensed, or authorized source. As multiple independent investigations have confirmed, Perplexity acquires this material through large-scale crawling and scraping systems—both declared and undeclared—that indiscriminately copy entire texts from across the internet and beyond.[47]

107. Perplexity's own behavior suggests that it relies on the full text of books. Despite acknowledging in responses that books are copyrighted, and that it cannot produce "line-by-line chapter notes," Perplexity is capable of doing exactly that.[48] Upon request, it can produce detailed, chapter-by-chapter accounts of works, including descriptions of plot turns, chapter-specific structure, and thematic sequencing. In certain instances, the sources Perplexity cites for its chapter-by-chapter descriptions do not include the underlying information that it produces in response to queries.[49] That information is in the complete, original books.

108. The recently-filed *New York Times v. Perplexity* complaint alleges, based on forensic evidence, that Perplexity's systems routinely crawl, copy, and store expressive content in violation of copyright law. For example, the complaint alleges that Perplexity: (1) builds and operates a massive "AI-First" search index

---

[47] *See, e.g.,* Gabriel Corral et al., *Perplexity is using stealth, undeclared crawlers to evade website no-crawl directives*, CLOUDFLARE (Aug. 4, 2025), https://blog.cloudflare.com/perplexity-is-using-stealth-undeclared-crawlers-to-evade-website-no-crawl-directives/; Dhruv Mehrotra and Tim Marchman, *Perplexity Is a Bullshit Machine*, WIRED (June 19, 2024, 9:00 AM), https://www.wired.com/story/perplexity-is-a-bullshit-machine/.

[48] *Perplexity Conversation*, ("what is John Carrey[r]ou's Bad Blood book about"), (https://www.perplexity.ai/search/what-is-john-carreyou-s-bad-bl-F12yAyhSQbatnBcu6TqgTQ#0).

[49] *Id.* (citing sources for its summary of Chapter 19 that do not include the information Perplexity provides about Chapter 19).

populated through direct copying of protected works; (2) uses both "PerplexityBot" and "Perplexity-User" agents to scrape websites and copy non-public content; (3) copies content for use in its LLMs and retrieval-augmented generation (RAG) pipelines; and (4) outputs detailed summaries, paraphrases, and quotations that substantially reproduce copyrighted texts.[50]

109. Independent investigations corroborate this pattern. WIRED reported that Perplexity produced detailed summaries of WIRED's articles even though WIRED explicitly blocked Perplexity. Engineers confirmed that the chatbot was "surreptitiously scraping" and recapitulating protected content "in detail" that was not publicly available.[51]

110. Cloudflare's investigation further found that Perplexity operates stealth crawlers designed to evade detection. According to Cloudflare: (1) Perplexity used undeclared user agents that impersonated Google Chrome; (2) Perplexity used multiple undisclosed IP ranges to circumvent no-crawl directives; (3) customers who blocked Perplexity's known crawlers found Perplexity still scraping their sites anyway; and (4) Perplexity's activity "evade[d] website blocks" and undermined publisher controls.[52]

111. On information and belief, Perplexity's model  has required Perplexity to make unauthorized reproductions of each work, including copies during scraping, ingestion, and deduplication. Perplexity's ability to output chapter-specific contentcorroborates that the models were trained and/or optimized withpirated copies of Plaintiffs' works.

---

[50] *See* Compl. at 3-4, *The New York Times Company v. Perplexity AI, Inc.*, 1:25-cv-10106 (S.D.N.Y. Dec. 5, 2025), ECF No. 1.

[51] Mehrotra and Marchman, *Perplexity Is a Bullshit Machine*.

[52] *See* Corral et al.,  *Perplexity is using stealth, undeclared crawlers to evade website no-crawl directives*.

**M.    Perplexity's Infringement Was Willful.**

112.    Perplexity's infringement was willful. As Cloudflare and WIRED independently confirmed, Perplexity intentionally deployed stealth crawlers and undeclared automated agents to evade copyright protections and access content it knew it was not authorized to copy.[53]

113.    Cloudflare found that Perplexity impersonated Chrome browsers, used concealed IP addresses, and intentionally bypassed restrictions to obtain content.[54] The purpose of such evasion is unmistakable: to gain access to copyrighted text that Perplexity knew it was forbidden to crawl.

114.    The *Times* complaint likewise alleges that Perplexity continued to access and copy prohibited content even after written cease-and-desist demands, "hard-block[s] of PerplexityBot and Perplexity-User," and explicit revocation of access.[55] Perplexity continued to make over 175,000 unauthorized access attempts in a single month after being technically and contractually barred.[56]

115.    Perplexity knew that its conduct violated copyright law. The *Times* repeatedly informed Perplexity in writing—beginning in March 2024—that Perplexity was unlawfully scraping and copying copyrighted material; Perplexity refused to stop.[57] Instead, it escalated its crawling behavior using stealth methods to avoid detection.

116.    Perplexity also publicly markets itself as providing users with the ability to "skip the links" and read "a single, comprehensive answer that summarizes

---

[53] *See id.*; Mehrotra and Marchman, *Perplexity Is a Bullshit Machine*.

[54] *See* Corral et al.,  *Perplexity is using stealth, undeclared crawlers to evade website no-crawl directives*.

[55] Compl., *New York Times*, 1:25-cv-10106,  at 28-29.

[56] *See id.*

[57] *Id.*

everything you need to know," thereby advertising that it substitutes for underlying copyrighted works.[58]

117. Perplexity's conduct reflects intentional, systematic, and commercially motivated exploitation of copyrighted works. It intentionally circumvented protective barriers, accessed materials it knew it was forbidden to copy, ignored written legal demands, and profited from generating expressive content that directly substitutes for Plaintiffs' books.

118. Perplexity's infringement was neither accidental nor negligent—it was deliberate, concealed, repeated, and performed at massive scale.

## V.    CLAIMS FOR RELIEF

### COUNT I

### Copyright Infringement (17 U.S.C. § 501)

### (Against all Defendants)

119. Plaintiffs incorporate the allegations above.

120. As the respective owners of the registered copyrights in the Infringed Works, Plaintiffs hold the exclusive rights to those books under 17 U.S.C. § 106.

121. Each Defendant—including Anthropic, Google, OpenAI, Meta, xAI, and Perplexity—without authorization from Plaintiffs, copied, downloaded, reproduced, ingested, parsed, embedded, and used pirated copies of the Plaintiffs' works in the development, training, fine-tuning, and deployment of their commercial large language models. These acts violated Plaintiffs' exclusive rights under § 106.

122. Defendants' infringement occurred repeatedly throughout the lifecycle of their AI-model development pipelines. As alleged above, Defendants:

---

[58] *What is Perplexity?*, https://perma.cc/Q4VM-DYUJ (accessed from *Dow Jones & Co., Inc. v. Perplexity AI, Inc*., No. 1:24-cv-07984-KPF, at Dkt. 46 (Second Amended Complaint) n.1 (S.D.N.Y. Jan. 28, 2025)) (last accessed Dec. 22, 2025).

- acquired Plaintiffs' books from shadow-library repositories such as LibGen, Bibliotik, Z-Library, Books3, and other known piracy sources;
- reproduced additional copies during ingestion, preprocessing, storage, deduplication, formatting, and/or tokenization; and
- while training the model, and/or through retrieval-augmented generation, made even more copies of the text—because every training pass (each epoch and each step of gradient descent) automatically requires creating and working with fresh versions of that text.

123.    Defendants' reproductions of Plaintiffs' copyrighted works were made without permission, license, or consent and violated Plaintiffs' exclusive rights under the Copyright Act.

124.    Defendants' infringement was willful. As alleged above, each Defendant knowingly trained its models on and/or optimized its product with datasets saturated with pirated books, including Plaintiffs' works; relied on shadow-library corpora they knew to be illegal; ignored internal and external warnings; attempted to conceal the composition of their training datasets; and continued copying after public reports, lawsuits, law-enforcement seizures, cease-and-desist notices, and industry-wide alerts made the illegality unmistakable.

125.    Upon information and belief, Defendants have made and will continue to make substantial profits and gains to which they are not in law or in equity entitled.

126.    Plaintiffs are entitled to all remedies available under the Copyright Act, including statutory damages under 17 U.S.C. § 504(c) of up to $150,000 per infringed work per Defendant for willful infringement.

127.    Plaintiffs are entitled to recover attorneys' fees and costs under 17 U.S.C. § 505.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

128.   Judgment in favor of Plaintiffs against each Defendant;

129.   A declaration that each Defendant has infringed Plaintiffs' exclusive copyrights under the Copyright Act;

130.   A declaration that such infringement is willful;

131.   A permanent injunction enjoining each Defendant and all those acting in concert with them from engaging in the infringing conduct alleged herein;

132.   That each Defendant be directed to account to Plaintiffs for all gains, profits, and advantages derived from their unlawful acts;

133.   An award of statutory damages under the Copyright Act;

134.   An award of restitution, disgorgement, costs, expenses, and attorneys' fees as permitted by law (including those allowable under 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(4)–(5));

135.   Pre- and post-judgment interest on the damages awarded to Plaintiffs; and

136.   Further relief for Plaintiffs as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

COMPLAINT

Dated:  December 22, 2025

Respectfully submitted,

*/s/ Elizabeth Brannen*

Elizabeth Brannen (SBN 226234)
John Stokes (SBN 310847)
Lauren Martin (SBN 294367)
**STRIS & MAHER LLP**
17785 Center Court Dr N, Ste 600
Cerritos, CA 90703
T: (213) 995-6800
F: (213) 261-0299
ebrannen@stris.com
jstokes@stris.com
lmartin@stris.com

Bridget Asay (*pro hac vice* forthcoming)
15 East State Street, Suite 2
Montpelier, VT 05602
T: (802) 858-4285
basay@stris.com

Jacqueline Sahlberg (*pro hac vice* forthcoming)
1717 K St NW Suite 900
Washington, DC 20006
T: (202) 800-5749
jsahlberg@stris.com

Devin (Velvel) Freedman (*pro hac vice* forthcoming)
Kyle Roche (*pro hac vice* forthcoming)
Alex Potter (*pro hac vice* forthcoming)
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th Street, Suite 915
New York, NY 10017
T: (646) 494-2900
vel@fnf.law
kroche@fnf.law
apotter@fnf.law

*Counsel for Plaintiffs*

34